Thank you, Sasso. On behalf of Mr. Virgen-Mendoza, I would like to reserve three minutes. All right. Keep your eye on the clock. I'll try to help you out. Thank you, Your Honor. Conspiring to aid someone's flight from prosecution and conspiring to aid someone's flight to Mexico to avoid prosecution are two separate crimes. One is state, the other is federal. Proof of one is not proof of the other. The federal government cannot usurp the power of the state to prosecute its own offenses absent proof beyond a reasonable doubt that the individual also committed an offense against the United States. The government did not do so here. In fact, the government argued to the district court, to the jury, and to this court on appeal in the co-defendant case that it did not need to do so with respect to each individual defendant. This court in Quiroz said that was wrong. The law is clear, A and B. Let's assume that we accept your argument. Quiroz was already heard. The appeal was already heard by another panel. Is there a difference in the evidence as to Mr. Quiroz as opposed to your client? Yes, there's a significant difference, Your Honor. So in terms of Conrado Vergen-Mendoza, the evidence is that he drove north for two hours, and there's absolutely no evidence at that point in time that there was a plan to ferret Pablo to Mexico. We do not have any inkling of a plan to ferret Pablo to Mexico until Adrian, who is the individual who has connections to the drugs, the smuggler, doesn't happen until well after Conrado has, in the government's own words, disconnected from the conspiracy, meaning he has no contact with the co-conspirators. So we have Adrian after Conrado has already dropped off Pablo, gone home, and called law enforcement. After that, we then have Adrian waving to the smuggler friend. That's an hour after. Right. I mean, I certainly understand why you would segment it in that fashion. But now on appeal, every inference, reasonable inference, is drawn in the government's favor. So there was a meeting or a conversation at, I think, the aunt's house. And so I take it that what the government would argue is that Mexico may not have been explicitly mentioned, but it was obvious to individuals who were present that that's what they were talking about. Can you address those inferences? Let's look at that. Because what we have there is we have, at best, Pablo saying that he wants to leave. And the uncle is very clear on the timetable of that. That happens after the blue alert. So right after the blue alert is when Pablo says, you know, I want to leave. And the uncle is also clear that right after the blue alert, Pablo immediately left, didn't say goodbye. So he said, I want to leave, and immediately left. Now, the uncle and the aunt assumed that Pablo, when he said, I want to leave and left, was talking about Mexico. And did Conrado think that? Did he assume that? We don't know. That's pure speculation. And the issue here, it doesn't matter whether Pablo aspired one day to go to Mexico. The evidence is crystal clear from the aunt and uncle. There was absolutely no plan in place to do so. So the issue here is not what Conrado could possibly have assumed, but whether he had the specific intent. Right, right. No, I think the issue really is whether that conversation and the other surrounding facts, the fact that he had family in Mexico, this was an extremely serious crime. Everybody was going to be out looking for him. Whether the inference is one that's reasonable to be accepted by the jury. The other people present at that conversation clearly inferred that he was talking about fleeing down to Mexico. It was obvious to them. So the question is, if the government had argued it to the jury, it could also have been obvious to the jury that your client also reached the same inferences. The real problem in this case is whether there was a misargument or misinstruction. So can you really focus on that? Sure, Your Honor. But I do want to be clear. There has to have been a plan. So the Supreme Court is crystal clear that evidence that goes to the Federal jurisdictional element has to be clear and unambiguous. You cannot pile inference upon inference. So simply an assumption that someone was going to Mexico, if Pablo even — if Conrado even thought about it, cannot serve as the basis for a conviction. And that's incorrect. And I wasn't suggesting otherwise. It is — it is, if we accept your argument, knowledge that he was headed to Mexico. Right. But that knowledge can be inferred. Right. So now — now, with regard to the jury instruction, there's — you're not contesting that the jury instructions are adequate, right, given what the Kuros panel said? Absolutely. The jury instruction is adequate. The district court and the government didn't understand it. But it definitely did, if you parse through the whole thing, require the specific intent to get someone to Mexico. But the government argued in its rebuttal that it did not even need to prove that if Pablo simply — if Conrado simply aided Pablo's — in hiding, that that was sufficient. And we can look at what the jury actually found. That is the most compelling evidence here. The jury — the government, in its closing, urged the jury to find all of the overt acts that it believed applied to the conspiracy that it found. And, revealingly, the jury did not find a single fact pertaining to removing Pablo to Mexico as part of the conspiracy that it found against Conrado. All of the facts pertaining to Adrian, who is clearly the mastermind of the plan to go to Mexico, the burner phone, the money to — for Mexico, the communication with the smuggler, the jury found — did not find any of those acts applied. I think it's crystal clear the jury followed the instructions that the — the district court gave repeatedly, and the government argued, which is that all they needed to do was find flight to avoid prosecution, and that was sufficient. And that's what they did, and that is a State offense. And the Federal government does not have the authority to prosecute a State offense. Mr. Asso, when I read through the closing arguments, it seemed as if the government was arguing both points, that it was a flight to avoid prosecution and also, at various times, also arguing to avoid prosecution across State lines. So how can we be sure that the jury was misled by potentially, you know, confusing statements as to what the law is? Well, I think we can look at literally in terms of what they found. That's, I think, the most compelling evidence, that they didn't find any of the facts that pertained to ferreting Pablo to Mexico. What they found is simply that Conrado drove Pablo in a circle and that he made some statements to law enforcement in his initial interview that were — not all of them were as truthful as ideally he should have been. That's what they found. That's the conspiracy that they found against Conrado. So your point is the evidence was so weak as to what Conrado knew about any potential plan to go to Mexico, that in combination with the government's arguments that they only needed to have one co-conspirator know about the plan, that that tipped it over into a prejudicial State? Yes, Your Honor. I think it's beyond that the evidence is weak. It's nonexistent. The aunt and uncle testified there was no plan over and over and over again, that they just — that Pablo simply wanted to stay there for three days to figure out what he was going to do. Whether he someday aspired to go to Mexico is not a plan to go to Mexico. So Conrado had to actually sign on to a plan with the specific intent to ferret Pablo to Mexico, and he could not possibly have done that when there actually was no plan. And the evidence is clear when that plan happened. That plan happened 10 hours after that — the first phone call when Adrian called Pablo. There is no action about smuggling anyone to Mexico until long after Conrado has started talking to the police. We — Well, now, circling back to Judge Nguyen's earlier question, the — the Quiros panel did find that Mr. Quiros — that there was sufficient evidence of his knowledge of this plan. Absolutely. I take it, though, that you're saying all — he was involved with the brother Adrian in the day after Conrado turned over the phone. And there were — there was other — there were other things for the jury to be able to make that sort of finding. It was crystal clear that Eric was involved, because what we have is the initial wave to the smuggler. We don't even have an ask. That's at 1 o'clock. Then we have an hour — over an hour later, we have Adrian telling his smuggler friend, I'd like to get somebody out to Mexico. The smuggler friend says, I don't know what you're talking about. If there was a plan in place, Adrian would have immediately followed up and said, this is what I'm talking about. But he didn't. It took another approximately — I think it was four and a half hours after that, and it was only after Eric and Adrian and Pablo met together in El Nido. The culmination of that meeting is when the phone call to the smuggler actually happened. That's when the plan got put in place. Before that, we simply have Adrian sort of stewing about it, and he's stewing about it after Conrado is disassociated from the conspiracy. So we don't even have the stewing happening, let alone the plan happening. So it's not possible for Conrado to have actually had the specific intent to further a plan that didn't actually exist. One other question. As I saw Judge Drozd in the transcripts, this issue about what knowledge was acquired for this very unusual charge didn't come up in the trial briefs. Why is that? Why was this not properly briefed below in the first place? My understanding, and I wasn't there, is that the defense counsel did not understand the position that the government was going to take. Now, in a perfect world, as Judge Drozd said, at that point in time, some briefing would have been helpful instead of e-mails late at night. But that's what it was. It was e-mails late at night to address this issue. And, I mean, I don't think it's — it seemed like it really wasn't actually that complicated. I think the law is crystal clear under FIOLA, as well as Ingram, that when you have a conspiracy that doesn't come to fruition, the only way that Federal jurisdictional element is going to be established is through the knowledge of the defendants. It really wasn't an earth-shattering concept. But because it was done on the fly, it was missed. Right. I was surprised that it was done on the fly, given that there was opening statement. I would think that the defense was focused right on the lack of knowledge point. Understood, Your Honor. And I — in reality, we really shouldn't be here because this really isn't that complicated. And I think if it was briefed, I think it would have been obvious to — to the judge  Although the — I'm sorry to interrupt, but the — I don't think it was in the opening statements because I don't think this issue even arose until right before jury instructions. Is that right? I don't think either the government or the defense brought up this knowledge issue in the opening statements. That is definitely when there seemed to be a flurry of activity at that time. That is correct. Okay. I know you wanted to save some time. Yes. Thank you, Your Honor. Thank you. Good morning. Good morning. And may it please the court. I am Assistant United States Attorney Mike Tierney, and I represent the United States today. You weren't the trial counsel, though, right? I was, actually, Your Honor. Oh, you were. I was part of the team of three. I see. So I can speak — But you didn't do the closing. I'm sorry? Not the closing. I did not do the closing or the rebuttal. I did the opening, though. There was ample evidence in this case that Virgen Mendoza, understanding that his brother's Mexico and that he was fleeing from police, acted to help that plan, to flee from police and to get to Mexico. And so this court should affirm the verdict. That evidence consisted of four interrelated types. First, as you already discussed with opposing counsel, at the aunt and uncle's place, Paulo, the killer, announced his plan, which was to lay low for a few days and then go to Mexico. Second, after hearing that plan, Virgen Mendoza, the defendant here, acted to help it by driving Paulo around and bringing him to people and places where he thought that Paulo could accomplish the heightened numbers. Mr. Turner, was the word Mexico used in that visit at the aunt and uncle's house? It's not clear, Your Honor, and it doesn't matter. So on direct exam, both the aunt and uncle said that Paulo said, I want to hide out and then go to Mexico. So that's at the aunt's testimony is in the record at 4 ER 520. What you have, counsel, is that what you have is witnesses who sometimes said that maybe Mexico was mentioned, but even if it wasn't, it was so obvious to them that they reached that inference. Now, your argument relying on inferences would be a heck of a lot more persuasive if you hadn't persuaded the judge to block the defense from making their argument that actual knowledge was really required and there's a gap in the evidence demonstrating the defendant's knowledge. That's what makes this case difficult for the government in terms of arguing harmless error. You do get all inferences in your favor. And had you argued the inferences, the jury had been properly instructed. I mean, the instructions were super clear and the defense had the full opportunity to argue the knowledge point. I don't think we'd be talking about the same issues on appeal today. Well, Your Honor, I'd say a couple of things in response to that. First, our position at trial was that while we may not have, in the full legal sense, needed to prove that each one of the conspirators understood or believed that Verhindman that, sorry, that Paolo was going to Mexico, we did as to each one of them. As a matter of fact, we made that clear and close. You did argue it. You did argue it, but the problem is the defense didn't get the opportunity to argue the opposite. Oh, the defense did argue, Your Honor. It was clear at trial. Mr. Verhindman does his trial counsel argued exactly the same sorts of things that opposing counsel just argued here, which is the statement. Did they get to argue that actual knowledge was required? Yes. Because I'm looking at the rebuttal here with the government counsel saying the interstate travel requirement may be established not by knowledge, actual knowledge that the defendant or that Paolo, sorry, was heading to Mexico, but by belief. Actual knowledge is not required. That's right, Your Honor. And then there was an objection by defense counsel, and then the prosecutor went on to say we've established. Objection, and the ruling was overruled. Right. And the prosecutor then goes on to argue that each defendant believed Paolo was traveling to Mexico. That's correct, Your Honor. And in a conspiracy, that's what the prosecutor is getting at here. In a conspiracy, what is important is what's in your mind. It's a subjective belief. That's why in our answering brief, we cited to cases like Bosch, which also involves the same charging structure here, which is a conspiracy to aid and abet a substantive offense. And there, it was a government sting operation. So what they are agreeing to is what they think is they're going to be importing drugs or they're going to be distributing drugs. But the difference, Mr. Tierney, is that in Bosch, it was a completed crime. And Fiolo talks about that unique circumstance of an unfulfilled plan. And that's the difference that we have here where if this is a matter of federal concern, there has to be some sort of knowledge of the object of the conspiracy to move Paolo across state lines. So it seems to me from reading Fiolo and from how the Kiros panel understood it, there had to be a knowledge element involving each of the co-conspirators that they knew that the plan was to move him across state lines. But as Judge Nguyen is pointing out, defense was not allowed to argue that legal point. They may have argued that Mr. Virgen Mendoza didn't know about the plan, but they weren't allowed to argue that that's not what the law is, that the law requires this knowledge. So just to get to my question, did the government shift its burden of proof by not being required to prove beyond a reasonable doubt that it had to show his specific knowledge of this plan? No, Your Honor. The government did prove beyond a reasonable doubt that Virgen Mendoza understood the full plan, which was that Paolo wanted to hide for a few days and then go to Mexico. And I think that's clear from the Kiros panel opinion. And when you think about the evidence that existed regarding Defendant Kiros and put it in comparison to the evidence against Virgen Mendoza here. So the statement about going to Mexico at the aunt and uncle's house was the same as to both Kiros and Virgen Mendoza. They were both there. They were both there, right. Okay. So then let's set that aside. What's the other evidence as to Mr. Kiros regarding his understanding of Mexico? Well, there is no direct evidence. What there is is evidence that he was in the same room or having conversations with Adrian, the brother who was contacting the smuggler. But we have no evidence from there other than an inference that they may have talked about Mexico. So when we think about Kiros. Well, there is evidence that Adrian was setting things in motion. You know, this Facebook wave, the message to the smuggler, and Kiros was there with him when or at least around the time that these messages were transacted of payment and other, you know. So there are things to, if we're drawing all inferences in favor of the prosecution, that you can draw with regard to Kiros' knowledge that I just don't see with Mr. Virgen Mendoza. He's just not present for any of those actions. He may not be present for those actions, Your Honor, but what do they mean in terms of the understanding about Mexico? So there are actions where he's with Adrian, but the only direct evidence, the evidence in this case, the only one that talked specific to Mexico for both Mr. Kiros and Virgen Mendoza was that conversation at the aunt and uncle's house. I don't think that another panel of this Court would have said that there was ample evidence regarding an understanding, Kiros' understanding, that they were going to Mexico if they were basing it only on just the actions with Adrian because there was no evidence about them actually talking about Mexico. That's in contrast to direct evidence where, weighed in the light most favorable to the government, Paulo says exactly what his plan is, which is to go to Mexico. So that key evidence, and that was always the key evidence at trial, was the same for both co-defendants. And I'd like to also highlight, Your Honor, a couple of differences where the evidence is even stronger against Mr. Virgen Mendoza, especially on the Mexico point, because Virgen Mendoza testified at trial, and he was asked about whether he knew that Paulo was going to Mexico. And, of course, he denied it. And, of course, the jury is free to disregard that testimony, particularly because what he said regarding Mexico was of a piece with his strained denials of intent for other things. So, for example, when the prosecutor asked him, did you know that you're, well, you knew that your brother had no legal status, essentially, and he had lots of relatives in Mexico. Again, going to this inference of that's the natural place to go. Mr. Virgen Mendoza denied that he knew what his brother's legal status was, even though he had admitted that to police before. And the jury certainly could have inferred that he knows how bad it would be up on the stand to admit, I know, I understand, just like anyone would have in the circumstances, where Paulo was going. And that when he said those words to the aunt and uncle, that's what he meant. Another piece of that was the prosecutor asked him whether there may have been, you know, something less than the statement Mexico at the aunt and uncle's. And the way of getting about that was to ask him, well, south of the border essentially would mean the same thing as the word Mexico, right? And Virgen Mendoza said, I don't know. The prosecutor asked him at 8 ER 1873 whether the phrase going south means Mexico. And he said, what does that mean, essentially, going south of the border? And then the prosecutor repeated the question, and he said, I don't know. Going south of the border, I don't know what that means. She followed up, you don't know what that means? No. So, again, that's part of the evidence that the jury can consider. I think there was a witness that testified that going south could have meant Los Angeles. I mean, what you're asking is to place a lot of weight on the notion that going south or getting out of here, you know, or the assumption that the aunt and uncle made is enough to prove very clearly that he knew of the plan to get to Mexico specifically. Maybe taken in isolation, it might be too much to place on those words, Your Honor. But none of this is taken in isolation. Again, we're talking about the key evidence, which is what does the statement at the aunt and uncle's mean? It means that he was going to Mexico. And in taking all rational inferences in favor of the government, what was happening during that time on the stand is that Virgen Mendoza knew how damaging it would be to admit all of those circumstantial facts that pointed to the aunt and uncle and everybody hearing that conversation. Let me ask you this, counsel. I apologize for interrupting, but I want to make sure that I understand your answer on a point that we had talked about earlier in response to Judge Sanchez's question. As I recall, when the government, before closing, asked the district court to argue that only one person, one co-conspirator, had to have knowledge, the defense objected to that. And they specifically asked, as I recall, to argue the opposite, the point of law, that essentially the government had to demonstrate each conspirator's knowledge. And the district court denied them that request. Right? In other words, you got to argue no actual knowledge was required on the defendant's part, only one person had to know. They didn't get to argue the opposite of that. And so, you know, we're talking a lot about inferences in combination drawn in the government's favor that a reasonable jury could accept. And as I said earlier, that's normally the case. But what do you do with the fact that they didn't get to argue and to counter the government's point of no actual knowledge is required on behalf of each defendant? Because we're talking about harmless error analysis here. I know you haven't conceded that point, but if we find that this error and each defendant had to know that the ultimate destination was Mexico, I don't want to be derailed by talk of inferences and all that, because it is in the government's favor, but they didn't get to argue that point of law. So isn't that fatal to your harmless error argument? No, Your Honor, because the arguments that we sort of asked for with the judge, that is, could we explicitly argue that only one conspirator needed to know, weren't actually what was argued in closing argument. Part of it was there was a statement no actual knowledge is required. You argued that each defendant believed it. The defendant got to argue that their client didn't know, but they didn't get to argue that actual knowledge on behalf of their client was required. That's the point that I want you to focus on. Sure, Your Honor. And I'm sorry, I just want to make clear what my response is here. That statement, what that meant, it didn't mean we only have to prove knowledge as to one. What it meant is what we have to prove is a subjective belief of the conspirators. So that is sufficient to prove that the plan was to get him to Mexico. It's not saying that we only need to prove it as to one, and that's clear because Ms. Escobar, after the objection, said, we've established beyond a reasonable doubt that each defendant believed Paolo was traveling to Mexico. So that statement about actual knowledge was not saying we only need to prove it as to one. It was saying a subjective belief, a subjective understanding is sufficient in a conspiracy context. But then if that's the case, that would have been a departure from what counsel argued out of the presence of the jury before Judge Droz, where this issue was teed up as we intend, you know, what the parties intended to argue. And government's counsel argued that we don't need to prove, you know, that each co-conspirator had that knowledge, we only need to prove one. And so despite having made that point and defense counsel saying can we argue the opposite and Judge Droz say no, you're saying they argued something else to the jury later on. Yes, Your Honor, and I'll explain why that was. It was because once we had those jury instructions locked in, and I see my time is growing short. Go ahead and finish your answer. May I complete my answer? Thank you. Once those jury instructions were locked in, the jury, we talked about it, and we decided, we knew that explicitly arguing in our belief, explicitly arguing that only one co-conspirator needed to have knowledge, and again, we extend that to mean subjective belief, he thinks he's going to Mexico, was a position that while we thought was legally correct, was one that, you know, could be subject to challenge. And so that's why at trial what we focused on when it became an issue. So in the initial closing, the government explains all the elements, including the interstate element. It explains why, in their view, the evidence from the aunt and uncle means everybody there understands that they're going to Mexico. So Burhan Mendoza's counsel and other counsel come back in their closing and say, no, you've got to prove that Conrado knew that he was going to Mexico, and this conversation at the aunt and uncle's is not enough. Can I clarify? So what you're saying is that even though the government may have argued an erroneous point of law, let's say we accept that erroneous point of law to the district court, that never actually played out in the actual closing argument. Is that what you're saying? Yes, Your Honor. And when we got the response, the opening brief from Burhan Mendoza's counsel, I went back in the record to try and make sure, okay, did we ‑‑ I know we thought that that was a correct statement of the law, but that could be, you know, that could be a tough position. Did we explicitly say that in front of the jury? And at least on my review of the record, I don't believe we did. I believe we argued what was necessary. All right. I'm glad you clarified that because I missed that point from your brief, frankly. Okay. Here's my question for you. So, Mr. Tierney, you started out saying you had four points of evidence. Right. And the way I understand this is that you're saying if we end up following queer nose and then we have to figure out is it harmless error or was there prejudice? And as I understand what you're saying, that it's a harmless error, that there is no prejudice, is that you got four facts that you were trying to tell us about. And that one was at the aunt and uncle's house. Two was Burhan Mendoza acted to help out. But I never got three and four written down. And so I'm looking for three and four. Three and four. Three is making false statements to law enforcement in order to protect the conspiracy and especially the key detail of Paulo's location. That's one of the overt acts that the jury found Burhan Mendoza guilty on, beyond a reasonable doubt. And then the fourth one would be his non-credible testimony at trial that underlined each one of the necessary elements of intent, including Mexico, as I described. I think it was in response to Judge Nguyen's question, maybe Judge Sanchez's question, regarding these sort of inferences about Mexico and the circumstances. Thank you. Questions? All right. Thank you very much, counsel. Let's put three minutes on the clock, please. The government spends a lot of time. Just a minute. Just a minute. I'm having her put three minutes on the clock. Three. All right. The government spends a lot of time talking about belief. We need to not lose fact that this is a conspiracy to aid and abet. So we're also talking about specific intent. And I want to also look at the aunt and uncle's testimony, because the government, I think, kind of got a little creative here. There was no statement that the aunt and uncle made that said that Pablo said, I was going to stay three days and then go to Mexico. That's just absolutely not what happened. They said over and over again, Pablo wanted to stay for three days, yes. Did he say what he was going to do after those three days? No. Did he have a plan? He didn't have a plan. Pablo didn't say where he wanted to go after those three days, right. Yes. He just said he needed three days. So the idea that Conrado then drove Pablo all over the place after that, that's just not what happened. He drove home. He left Pablo in Merced. Can you, counsel, address the point that Mr. Tierney made, that even though they haven't conceded it, assuming that they argued an error in the point of law to the district court, that never manifested itself in the closing or rebuttal arguments by counsel? That's just absolutely not true. The district court told the defense counsel that it would sustain an objection if it argued that Pablo — that Conrado needed to have not only the knowledge but the specific intent to further a plan to ferret Pablo to Mexico, that it wasn't enough, that he simply helped Pablo hide. That's exactly what the government argued in its rebuttal. It specifically told the jury that, and that is what the jury found based on the overt acts that it found. And I would like to respond to the comment about Conrado's testimony. No one ever said going south around Conrado. So there was an objection made. That was the issue that played out there. No one said south around Conrado. No one said south of the border around Conrado. That is just a red herring. And in terms of Eric and Adrian, they had multiple conversations after the plan to ferret Pablo to Mexico was hatched. That's the key difference, and Eric handed Pablo off, and it is at the culmination of that meeting between Pablo, Eric, and Adrian that the plan was actually put in place. But it's crystal clear there was no plan at the time that Conrado helped Pablo in Mexico. And I want to be crystal clear, it doesn't even matter what Conrado believed Pablo's ultimate goal was. What matters is whether he knew there was a plan and whether he specifically intended to further that plan. And the government's own testifying investigative agent said, No, I don't believe he believed that Pablo was going to Mexico, and I don't believe that he understood he was going anywhere beyond El Nido. Can I just a quick clarification? Did the government argue that they just needed to prove belief in closing arguments or rebuttal arguments? Yes, Your Honor, and they did that again now. But, yes, they absolutely did it in the closing argument, and that's ultimately not what this case is about. It's not about belief because this is aiding and abetting. He has to have the specific intent to further a plan. And the Supreme Court in Ingram reminds us that a defense knowledge of the fact that necessarily sets in motion a conspiracy against the United States as opposed to an individual state must be clear and unequivocal. It is neither of those things here. It doesn't even exist. We cannot make out a conspiracy piling inference upon inference. And if we look at the testimony of what the aunt and uncle said, we don't even get the inference. And if we look at the timing of when the plan actually happened, there was no plan. The government proved a State offense that it lacked the authority to prosecute. Okay. Thank you, counsel. We've taken you over time, but let me make sure that my colleagues have no additional questions. Right. Thank you. Both sides for your argument. Very helpful. The matter is submitted and the decision will be issued in due course.
judges: NGUYEN, SANCHEZ, Bough